# UNITED STATES DISTRICT COURT

## IN THE DISTRICT OF IDAHO

| | |
|---|---|
| MARIA ANGELICA "ANGIE" CARBAJAL, | Case No. 4:19-cv-00287-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| HAYES MANAGEMENT SERVICE, INC.; HAYES TAX & ACCOUNTING SERVICES, INC.; and CHRIS HAYES, | |
| Defendants. | |
| HAYES MANAGEMENT SERVICE, INC., | |
| Counter-claimant, | |
| vs. | |
| MARIA ANGELICA "ANGIE" CARBAJAL, | |
| Counter-respondent. | |

## INTRODUCTION

Before the Court are (1) Defendant Hayes Management Service, Inc.'s Motion for Protective Order (Dkt. 90); and (2) Plaintiff's Motion for Sanctions Against Defendant Hayes Management Services and Chris Hayes (Dkt. 103). Plaintiff Maria Angelica Carbajal requested certain documents from Defendant Hayes Management related to the sale of its assets to Defendant Hayes Tax & Accounting Services, Inc. Hayes Management withheld the requested documents on the grounds that such documents are subject to the attorney-client privilege and filed its motion for protective order currently pending before the court, seeking to protect the documents from disclosure.

After Hayes Management's motion for protective order was fully briefed, Carbajal learned that Hayes Management and Defendant Chris Hayes, the president and owner of Hayes Management, failed to disclose certain non-privileged documents related to the sale of assets by them to Hayes Tax. Therefore, Carbajal now seeks terminating sanctions against Defendants Hayes Management and Chris Hayes on the grounds "they hid the existence of documents pertinent to the merits of this case, made false statements in response to discovery, and made false representations to the Court, and Plaintiff would never have known that nearly 100 pages of critical documents existed had Defendant Hayes Tax &

Accounting Services, Inc. not produced them to Plaintiff." *Pls' Br. re Mot. for Sanctions*, pp. 1-2, Dkt. 103-1.

The Court heard oral argument on both motions June 29, 2022, and the motions are at issue. For the reasons set forth below, the Court will deny Hayes Management's motion for protective order and grant in part and deny in part Carbajal's motion for sanctions.

## BACKGROUND

### 1. Carbajal's Employment Claims Against Hayes Management

On July 23, 2019, Carbajal filed this action against Hayes Management, alleging Hayes Management's president and owner, Chris Hayes, sexually harassed her and subjected her to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq. Compl.*, Dkt.1. Carbajal later amended her complaint to add claims for retaliation after Hayes Management filed counterclaims against her, which she alleges were filed purely to harass and retaliate against her for filing this action. *Am. Compl.*, Dkt. 30.

On February 28, 2020, Hayes Management filed a renewed motion for summary judgment, seeking dismissal of Carbajal's Title VII claims on the grounds that Hayes Management did not have 15 "employees" for 20 or more weeks in 2015 or 2016 and therefore did not meet the definition of an "employer"

under Title VII. The Court denied the summary judgment motion in a decision

entered on June 4, 2020, finding genuine issues of material fact precluded

summary judgment on the issue.

### 2. "Intent to Sell" Hayes Management

#### A. *Melissa Galles and Brandy Mann Form Hayes Tax to Purchase Hayes Management's Assets Two Weeks After Summary Judgment Is Denied.*

On June 18, 2020, two weeks after the Court's decision denying Hayes

Management's motion for summary judgment, Melissa Galles and Brandy Mann

formed Hayes Tax, with the intent of using Hayes Tax to purchase Hayes

Management's assets. *Hayes Decl.* ¶ 6, Dkt. 90-1. Melissa Galles is Chris Hayes'

daughter, and Brandy Mann was Hayes Management's Human Resources

Manager. At the time they formed Hayes Tax, Galles and Mann were aware of

Carbajal's claims against Hayes Management – both participated in preparing

statements to respond to Carbajal's charge of discrimination, and Mann also

submitted an affidavit in support of summary judgment in this action.

#### B. *Chris Hayes Testifies Under Oath That All Negotiations Relating to Asset Sale Were Oral Prior to Hiring Attorney Steven Wright.*

According to Chris Hayes, he had been discussing selling Hayes

Management's assets to Galles and Mann in "the years leading up to 2020," as it

had been his intent for many years "to begin retiring upon reaching age 65 or

shortly thereafter." *Hayes Decl.* ¶¶ 4, 5, Dkt. 90-1. Hayes says these discussions to

sell Hayes Management to Galles and Mann "became more and more concrete" in

2020, and "Melissa and Brandy formed an entity to be the purchaser, i.e., Hayes

Tax & Accounting Services, LLC, and terms were reached ***for which assets would***

***be purchased, at what price and on what terms for payment***." *Id.* ¶ 6 (emphasis

added). Hayes further testified in his sworn declaration that all discussions up to

the point between himself and Galles and Mann relating to the sale of Hayes

Management's assets "***were oral*** as our offices were just down the from each other

throughout that time." *Id.* ¶ 7 (emphasis added).

After reaching this purportedly "oral" agreement as to all key terms relating

to the asset sale, including the purchase price, terms of payment, and the assets to

be sold, Hayes claims that he and Galles and Mann "jointly" hired "Idaho Falls

attorney Steven Wright for legal advice and services, primarily to prepare

documents to reflect the sale of assets by Hayes Management to Hayes Tax, and to

counsel [them] on implications and ancillary issues he might spot." *Id.* ¶ 8. Mann

first emailed attorney Wright, copying Chris Hayes and Melissa Galles, on

September 18, 2020. *Wright Law Offices Privilege Log*, Dkt. 98 at 1. During their

first meeting with Wright, Wright explained to Hayes, Galles, and Mann that his

representation of both parties to the asset sale "posed just a potential conflict of

interest" that could be waived because the parties had completed all negotiations.

*Hayes Decl.* ¶ 9, Dkt. 90-1; *Wright Decl.* ¶ 6, Dkt. 90-2. Had the negotiations been

ongoing, the conflict would have been unwaivable, and Wright could not have

jointly represented both sides to the transaction. *See Idaho Rules of Professional Conduct* 1.7(b), Comment 7.

### C. Chris Hayes Drafts Four-Page "Intent to Sell" Memorandum Expressing His Intent to Sell Hayes Management to Galles and Mann.

Although Hayes testified that all negotiations relating to the asset sale before Wright was hired "were oral," at some point before Wright's hiring, Hayes drafted a four-page memorandum on Hayes Management letterhead titled, "Intent to Sell." *Supp. Ulrich Decl.*, Ex. B, Dkt. 93-3 at 64.[1]  The Intent to Sell begins, "***It is the intent for Chris S Hayes to sell the Hayes Management Services, Inc. to Melissa Galles and Brandy Mann***" with "the closing of this transaction on 1/1/2021 (actual closing date more likely to be done on 1/4/2021)." *Intent to Sell*, Dkt. 93-3 at 64 (emphasis added). As set forth in the document, the Intent to Sell "break[s] out the bullet points of the transaction for the benefit of all parties to review and come to agreement upon the terms and conditions of the overall sale," which such terms to include, among others, "***Parties to the sale/purchase***," "***What is being sold and what is included or excluded from the sale***," and "***Purchase price, down payment and payment schedule***." *Id.* (emphasis added).

---

[1] Although undated, it appears Hayes drafted this document sometime prior to August 6, 2020, as he states in the document "the 6th of August 2020 ***will*** mark the 30-year anniversary" of the founding of Hayes Management on August 6, 1990. *Id.*, Dkt. 93-3 at 65 (emphasis added). Hayes' use of the future tense, "will mark the 30-year anniversary" indicates that August 6, 2020, had not yet come to pass when Hayes drafted this document. Wright was hired in September 2020.

The "Intent to Sell" set the purchase price for Hayes Management at $500,000:

> The ***Purchase price of Hayes Management Services, Inc. is to be $500,000 (Five Hundred Thousand Dollars)***. Upon the signing of closing documents, a down payment of 20% (Twenty Percent) [or $100,000] will be required. The seller will carry the contract for the remaining $400,000 (Four Hundred Thousand Dollars) by allowing the first installment payment to be delayed until January 1, 2022 (1/1/2022).

*Id*., Dkt. 93-3 at 66 (emphasis added). According to the Intent to Sell, the $500,000 purchase price was to include "the overall operations of the business, the existing clientele of the business, the business name, blue sky aspects, etc." *Id.,* Dkt. 93-3 at 65. The Intent to Sell makes no mention of Chris Hayes' selling his personal goodwill associated with Hayes Management separately from the sale of Hayes Management's assets.

### 3. Sale of Assets to Hayes Tax

#### A. *Hayes Management Sells Certain of its Assets to Hayes Tax for $100,000.*

On December 31, 2020, Chris Hayes executed an Asset Purchase Agreement on behalf of Hayes Management, selling most of its assets, including its goodwill and client list, to Hayes Tax for $100,000 ("First Asset Purchase Agreement"). *Hayes Decl.* ¶ 18, Dkt. 90-1; *First Asset Purchase Agreement*, §§ 1.01, 1.02, § 5.02, Dkt. 66 at 1. This transaction closed on December 31, 2020, and required Hayes Tax to pay Hayes Management the entire purchase price of $100,000 at

closing. *First Asset Purchase Agreement*, § 1.02, Dkt. 66 at 1. This agreement mirrored the proposed terms in the Intent to Sell to the extent that the Intent to Sell required a down payment of 20% of the purchase price of $500,000, or $100,000, at closing.

### B. Chris Hayes Sells His Individual Goodwill Associated with Hayes Management to Hayes Tax for $400,000.

On the day after Hayes executed the First Asset Purchase Agreement on behalf of Hayes Management, he executed a second asset purchase agreement between himself, as an individual, and Hayes Tax, with an effective date of January 1, 2021 ("Second Asset Purchase Agreement"). Pursuant to the Second Asset Purchase Agreement, Hayes agreed to sell, and Hayes Tax agreed to purchase, Hayes' individual goodwill associated with Hayes Management, as well as Hayes' "concurrent execution" of restrictive covenants requiring non-disclosure, non-competition, and non-solicitation. *Second Asset Purchase Agreement*, §§ 1.02, 5.01(a), Dkt. 93-3 at 40, 44. Hayes sold these assets to Hayes Tax for $400,000. *Id.*

Unlike the First Asset Purchase Agreement, which required full payment at closing, the Second Asset Purchase Agreement deferred payment of the $400,000 purchase price "per the terms of the Promissory Note," which provided for payment of the purchase price in "120 equal monthly installments of $4242.62 ***beginning January 5, 2022***." *Id.* at §§ 1.02, 1.04; *Secured Promissory Note* ¶ 1.

Dkt. 93-3 at 47 (emphasis added). This deferred payment provision in the Second

Asset Purchase Agreement mirrored the proposed terms in the Intent to Sell to the

extent the Intent to Sell provided that the "seller" would "carry the contract for the

remaining $400,000 (Four Hundred Thousand Dollars) [of the $500,000 purchase

price] *by allowing the first installment payment to be delayed until January 1,*

*2022* (1/1/2022)." *Intent to Sell*, Dkt. 93-3 at 66 (emphasis added).

### C. Chris Hayes Agrees to Provide Independent Contracting Services to Hayes Tax for Tax Return Services.

In conjunction with the Second Asset Purchase Agreement, Hayes and

Hayes Tax also entered into a consulting agreement, effective January 1, 2021, by

which Hayes agreed to provide consulting services to Hayes Tax as an independent

contractor in exchange for Hayes Tax paying him $2,000 per month, plus a 40%

commission ("2021 Consulting Agreement"). *January 2021 Consulting*

*Agreement*, Dkt. 93-3 at 4-14. The term of the 2021 Consulting Agreement expired

after a year, and Hayes executed a second consulting agreement a year later, on

January 1, 2022, with substantially the same terms as the 2021 Consulting

Agreement, but with the monthly payment for his services reduced to $1,000 per

month ("2022 Consulting Agreement"). *January 2022 Consulting Agreement,* Dkt.

93-3 at 15.

Also in connection with the Second Asset Purchase Agreement, Hayes

executed a "Secured Promissory Note" for $400,000, providing for the deferred

payments referenced above; a "Security Agreement," creating a security interest in "all shares of capital stock" of Hayes Tax and securing Hayes Tax's payments under the $400,000 note; and a "Guaranty Agreement," by which Galles and Mann agreed to guarantee the payment of the $400,000 purchase price to Hayes in the event of Hayes Tax's default under the note.

Through all these agreements, Hayes Tax agreed to pay a total of $500,000 for assets related to Hayes Management – with $100,000 allotted to Hayes Management for its assets, including its client list and goodwill, and $400,000 to Chris Hayes personally for his individual goodwill associated with Hayes Management – the same purchase price set forth in the "Intent to Sell," drafted by Chris Hayes on Hayes Management letterhead, for "the sale and purchase of the business 'Hayes Management Services, Inc.' (HMS, Inc.)" by "the seller – Chris S Hayes and the buyers Melissa Galles and Brandy Mann." *Intent to Sell*, Dkt. 93-3 at 65.

### D. Attorney Steven Wright and Attorney John Simmons Participated in the Drafting of These Agreements in Connection With the Sale of Hayes Management's Assets.

Attorney Steven Wright prepared all the necessary documents related to the asset sale, including the asset purchase agreements, the consulting agreements, the promissory note, the security agreement, and the guaranty agreement. *Wright Decl.* ¶ 10, Dkt. 90-2. In addition, John Simmons, counsel in this litigation for Hayes

Management, provided legal advice, at Chris Hayes' request, related to the transactions regarding "the tax implications of different ways good will could be handled in the documents for the sale by Hayes Management of some of its assets to Hays Tax, given that Hayes Management is an S corporation and to minimize the tax bite, both for the seller as well as for Hayes Tax as the buyer, and also how to approach making determinations relevant to good will that would make it less likely that any tax court would allow the IRS to re-determine such with different approaches or methodologies." *Simmons Decl.* ¶ 5, Dkt. 90-3.

As noted, both Hayes and attorney Wright have testified under oath that the parties had already hammered out the basic terms, including the assets to be purchased, the price, and the terms of payment, prior to their hiring Wright to prepare the documents for the transaction. *Hayes Decl.* ¶¶ 6-8, Dkt. 90-1; *Wright Decl.* ¶ 4, Dkt. 90-2. But the only evidence of an agreed purchase price for Hayes Management's assets prior to the parties' hiring attorney Wright is the $500,000 set forth in the Intent to Sell drafted by Hayes, which document the parties provided to Wright to assist in his preparing the transaction documents. *See Sealed Wright Communications*, Dkt. 98 at 3-6.[2] Neither Hayes Management nor Hayes have submitted any evidence of when and how they decided to reduce this

---

[2] The Intent to Sell was included in Steve Wright's file provided to the Court for *in camera* review for the privilege issue.

MEMORANDUM DECISION AND ORDER - 11

$500,000 purchase price for Hayes Management's assets to $100,000 and allocate the remaining $400,000 to Hayes personally.

### 4. Carbajal's Second Amended Complaint

In mid-January 2021, Carbajal and her counsel heard rumors that Hayes had sold Hayes Management Services to his daughter, and Hayes Management's HR Manager. *Casperson Decl.* ¶ 3, Dkt. 103-28. They immediately began investigating the situation and discovered the existence of Hayes Tax. *Casperson Decl.* ¶ 4, Dkt. 65-4. Because of concerns regarding the purpose of the possible transaction and the impact on the litigation, counsel for Carbajal then contacted counsel for Hayes Management, Mr. Simmons, to inquire whether Hayes Management had, in fact, sold its business. *Casperson Decl.* ¶ 4, Dkt. 103-28. When counsel for Carbajal spoke with Mr. Simmons, he informed her that he did not know the details, and all he knew was that it was an asset purchase, and he did not have a copy of the agreement. *Casperson Decl.* ¶ 7, Dkt. 65-4. Carbajal's counsel asked for a copy of the agreement. *Casperson Decl.*, Ex. 2, Dkt. 103-28.

After inquiring with his client, Mr. Simmons provided Carbajal's counsel a copy of the First Asset Purchase Agreement reflecting the sale of assets to Hayes Tax by Hayes Management for $100,000. Hayes Management did not provide to Carbajal the Second Asset Purchase Agreement reflecting the sales of assets to Hayes Tax by Hayes for $400,000. Carbajal therefore only knew that Hayes

Management had sold most of its assets to Hayes Tax for $100,000 and had not transferred its liabilities as part of the agreement.

Fearing the sale of all its assets for the purchase price of $100,000 left Hayes Management defunct, with insufficient assets to cover a potential judgment in favor of Carbajal in this case, Carbajal moved to amend her complaint (1) to add Hayes Tax as a defendant based on successor liability, (2) to add Chris Hayes as a defendant based on alter ego liability, and (3) to add a claim for constructive trust. *Mot. for Leave to File Sec. Am. Compl.*, Dkt. 65. Carbajal also served on Hayes Management formal discovery requests seeking documents relating to the asset sale. *Ulrich Decl.* ¶ 3, Ex. A. Hayes Management objected to Carbajal's discovery requests related to the sale as irrelevant given the state of the pleadings at the time and indicated it would only respond to the requests if the Court granted Carbajal leave to amend. *Id.* ¶ 4, Ex. B.

On June 4, 2021, the Court granted Carbajal leave to amend, and Carbajal filed her Second Amended Complaint on June 7, 2021, naming Hayes Tax as a defendant based on successor liability and Chris Hayes as defendant based on alter ego liability, and adding a constructive trust claim against all defendants. These new claims introduced questions into this litigation of whether Hayes Management, through Chris Hayes, sold all of Hayes Management's assets for an unreasonably low purchase price, with the purpose of leaving Hayes Management

an empty-shell company and hiding its assets to avoid any potential judgment in Carbajal's favor. *See Memorandum Decision and Order*, p. 13-15, Dkt. 78.

## 5.   Hayes Management's Discovery Responses Related to the New Claims

### A.  *Hayes Management Drags Its Feet in Supplementing Its Discovery Responses After Leave to Amend is Granted.*

Once the Court granted Carbajal leave to amend her complaint, Carbajal's counsel asked Hayes Management to supplement its discovery responses related to the circumstances of the sale and its purpose. *Ulrich Decl.*, Ex. C, Dkt. 103-6 at 6. Even though leave to amend had been granted, Hayes Management still dragged its feet in providing substantive responses to Carbajal's discovery requests. *Id*. Rather than just supplementing its responses, Hayes Management accused Carbajal of having "quite scant facts" to support her new claims and demanded that Carbajal first provide it with evidence before it would respond to the discovery requests relating to the claims. *Id*.

After several emails back and forth regarding Hayes Management's supplementation of its discovery responses, Hayes Management's counsel agreed to have a telephone conversation with Carbajal's counsel on July 1, 2021. Plaintiff's counsel describes the conversation as "very bizarre and abusive," *Ulrich Decl.* ¶ 6, Dkt. 103-3, during which Hayes Management's counsel "insulted and

attempted to intimidate Plaintiff's counsel," *Pl's Br. re Sanctions*, p. 5, Dkt 103-1.[3]

Throughout these email and telephone communications between counsel, Hayes

Management continued to hide the fact that it had expressed an intent in writing to

sell its assets to Galles and Mann for $500,000, and then at some point reduced that

purchase price to $100,000. It also hid that Hayes and Hayes Tax had entered it a

separate agreement for the purchase and sale of Haye's individual goodwill for

$400,000.

### B.  Hayes Management Provides Evasive and Misleading Supplemental Discovery Responses.

When Hayes Management eventually supplemented its discovery responses

on July 6, 2021, it again failed to disclose the Second Asset Purchase Agreement

and other transaction documents related to the asset sale. Hayes Management also

did not produce the Intent to Sell, in which Hayes explicitly expressed his intent to

sell Hayes Management's assets to Galles and Mann for $500,000. Instead, in

answering discovery, Hayes Management relied on wordplay to avoid responding

to discovery directly or made outright misrepresentations that it had no

---

[3] According to Carbajal's counsel, during this conversation, counsel for Hayes Management suggested that Carbajal and her counsel were pursuing the case frivolously, stated that the lawsuit was "just another #metoo lawsuit" and that Carbajal was "making a mockery" of the Idaho Human Rights Commission administrative process. He also accused counsel of "making up the rule of thumb regarding valuation of an accounting business." *Ulrich Decl.* ¶ 6, Dkt. 103-3. According to Plaintiff's counsel, defense counsel then "attempted to intimidate" her by saying he was recording the conversation, and when Plaintiff's counsel asked for a copy of the recording, defense counsel said she would never get a copy of the recording. Defense counsel apparently ended the call by telling Plaintiff's counsel to "have a nice weekend," and to "think about how [she] ruined an innocent man's life." *Ulrich Decl.* ¶ 6, Dkt. 103-3.

nonprivileged communications or documents, other than the First Asset Purchase and Sale Agreement, related to the sale of its assets to Galles and Mann.

By way of example, in response to Interrogatory No. 24, which requested Hayes Management to "identify each offer to sell or offer to purchase Hayes Management Services, Inc. from 2012 to date," Hayes Management insisted that all offers and negotiations leading up to the Asset and Purchase Agreement between it and Hayes Tax "were oral only," such that "*there was no reason for and thus no log made of such offers in the back-and-forth of negotiating, and any attempt to identify such individually would be the matter of speculation, not of discrete memory.*"  The response in its entirety reads as follows:

> SUPPLEMENTAL RESPONSE (07/06/2021): Hayes Management Service, Inc. was not sold in toto. Only specific assets were sold. Thus, the value of Hayes Management in toto has nothing to do with the value of specific assets sold to Hayes Tax & Accounting. Nevertheless, no one has offered to purchase Hayes Management Services, Inc. No one has offered to purchase the stock of Hayes Management, which Chris Hayes has owned 100% since the creation of Hayes Management. Chris Hayes has not offered to sell stock in Hayes Management to anyone. No offer has been received by Hayes Management regarding the specific assets only as sold to Hayes Tax & Accounting on 12.30.2020, before the offer from Brandy Mann and Melissa Galles/Hayes Tax & Accounting to purchase any or all of Hayes Management's assets. *The only offers to purchase any assets belonging to Hayes Management were those that led to the [First] Asset Purchase Agreement, which was negotiated for purchase eventually by Hayes Tax and Accounting Services, Inc., by Melissa Galles and Brandy Mann. No such offers were made in writing; all were oral only. There was no reason for and thus no log made of such offers in the back-and-forth of negotiating, and any attempt to identify such individually would be the matter of speculation, not of discrete memory.*

*Ulrich Decl.*, Ex. D, Dkt. 103-7 (emphasis added).

The representation that the "only offers to purchase any assets belonging to Hayes Management were those that led to the Asset Purchase Agreement" between Hayes Management and Hayes Tax and such offers "were oral only" is directly contradicted by the Intent to Sell, which states that the "purchase of HMS, Inc. will be for taking ownership of the ***business entity***" and sets a "Purchase price of ***Hayes Management Services, Inc.***" for "$500,000 (Five Hundred Thousand Dollars)." *Supp. Ulrich Decl.,* Dkt. 93-3 at 66 (emphasis added). In other words, at some point, Chris Hayes expressed his intent ***in writing*** to sell ***Hayes Management Service, Inc. – the business entity*** – to Galles and Mann for $500,000, but Hayes Management failed to disclose this in its discovery responses.

When Carbajal's counsel sent a meet-and-confer email outlining what they perceived as deficiencies in the supplemental responses, Hayes Management again relied on wordplay in responding to the concerns and doubled down on the representation that all communications and documents related to the Asset and Purchase Agreement were oral or privileged. *Ulrich Decl.*, Ex. E, Dkt. 103-8. For example, when Carbajal's counsel raised concerns regarding Hayes Management's response to Interrogatory No. 24 requesting information about offers to sell or purchase Hayes Management, Hayes Management's counsel responded, "Apart from what would be speculation, Brandy and Melissa/Hayes Tax & Accounting

made no offer greater than $100,000 for those certain assets, which Hayes Management accepted." *Id.*, Dkt. 103-8 at 2. And when asked to "please ensure that *all* prior offers from 2012 to present are identified, including any informal offers or discussions," Hayes Management's counsel responded, "There were none. Hayes Management was not soliciting offers from anyone and none were received, except such from Brandy and Melissa that culminated in the 12.30.2020 sale of specific assets." *Id.*

Similarly, when asked to "please provide *all* responsive communications about *any* offers to sell or purchase any or all of Hayes Management or any assets thereof" regardless of what specific assets were discussed or not discussed, Hayes Management's counsel answered that no such offers were exchanged: "There were no sale/purchase offers communicated about all of Hayes Management. There were only nondocumented communications of offers to purchase the assets that were the subject of the 12.30.2020 Asset Purchase Agreement." *Id.*, Dkt. 103-8 at 2-3. Counsel for Hayes Management further represented that any written communications between Hayes, Galles, and Mann regarding First Asset Purchase Agreement were privileged as they had jointly hired attorney Steve Wright to paper the transaction once they had reached an agreement on all the terms, including the purchase price. *Id.*

In response Carbajal's closing request that Hayes Management provide "the supplemental documents and information immediately," or Carbajal would "advance this to the Court," counsel for Hayes Management stated, "Even to a court order, Hayes Management cannot produce what does not exist." *Id.*, Dkt. 103-8 at 4. Hayes Management again did not produce the Intent to Sell or the Second Asset Purchase Agreement.

### C. Hayes Management Represents to Court Staff That No Written Offers Related to the Sale of Hayes Management's Assets to Hayes Tax Exist.

The parties, however, paused any meet-and-confer efforts for several months while they tried to schedule a mediation. When these attempts to schedule a mediation failed, Carbajal's counsel contacted Court staff regarding the need of a discovery conference, which was held on January 26, 2022. *Id.*, Ex. F, Dkt. 103-9. Prior to the informal discovery dispute conference with Court staff, Hayes Management submitted its position statement, which consisted of Hayes Management's counsel's prior correspondence to plaintiff's counsel with some additional commentary regarding the discovery dispute conference. *Id.*, Ex. G, Dkt. 103-10.

In this position statement submitted to the Court, counsel for Hayes Management stated regarding the production of any offers to purchase or sell Hayes Management that the negotiations with Galles and Mann were "conducted orally and only after terms were reached were attorneys consulted to put together

the tax structure and documents for the deal. Ergo, there are no documented negotiations." *Id.*, Dkt. 103-10 at 3. Counsel for Hayes Management further represented that "Chris Hayes can only recall about the oral-only negotiations that no offer more than $100,000 was made by the buyers, Melissa and Brandy Mann— as was explained in the 7.9.2021 email to plaintiff's counsel." *Id.*

During the discovery dispute conference, Hayes Management agreed to produce some of the information at issue but continued to represent that other documents sought by Carbajal – including offers to buy or sell Hayes Management, beyond First Asset Purchase Agreement already produced – did not exist. *Id.* ¶ 11, Dkt. 103-3. The parties also agreed that the issue of attorney-client privilege covering communications between Hayes, Wright, and Mann relating to the creation and preparation of the First Asset Purchase Agreement would have to briefed. The parties eventually agreed to a briefing schedule, and Hayes Management filed its motion for protective order currently pending before the Court.

### D. Hayes Management Fails to Produce the Intent to Sell or Second Asset Purchase Agreement in Response to Carbajal's Sixth Set of Discovery Requests.

Prior to the discovery dispute conference, on January 18, 2022, Carbajal served her sixth set of discovery requests on Hayes Management. Although Hayes Management served its responses in a timely manner following the discovery

dispute conference, instead of producing the requested documents as it had done in the past, it stated, "Please arrange a time that is mutually convenient for inspecting such documents." *Id.* ¶ 13, Ex. J, Dkt. 103-13. After Carbajal's counsel sent multiple follow-up emails requesting that Hayes Management produce copies of the documents, Hayes Management eventually produced some tax and financial records but once again did not produce the Intent to Sell or the Second Asset Purchase Agreement.

### 6. Chris Hayes' Discovery Responses Related to the New Claims

On January 18, 2022, Carbajal served her first set of discovery requests on Chris Hayes. In response to a document request asking for copies of documents related to the purchase of assets by Hayes Tax & Accounting, Hayes stated that all negotiations related to the sale of those assets between himself, Galles, and Mann were "undocumented, oral communications only," and, once the parties reached an agreement, they "met jointly with Steve Wright," and thus any written communications and agreement drafts "are protected as attorney-client communications." *Ulrich Decl.*, Ex. O, Dkt. 103-18.

Hayes' response to Carbajal's request asking him to produce documents "showing *any payments or transfer of funds being made from Hayes Tax Accounting to Chris Hayes*" was similarly deceptive and misleading: Hayes Tax had been making monthly payments to Hayes pursuant to the 2021 and 2022

consulting agreements and had begun making additional monthly payments to Hayes beginning January 2022 pursuant to the Second Asset Purchase Agreement and Secured Promissory Note. Yet, Hayes responded that "there have been no payments from Hayes Tax to Hayes for the assets purchased by Hayes Tax from Hayes Management." *Id.* (emphasis added).

To date, Chris Hayes has produced no documents in response to Carbajal's document requests despite Carbajal's counsel's numerous meet-and-confer emails. He likewise has provided no substantive responses to Carbajal's second set of discovery requests – merely stating that he would respond after returning to Idaho at the end of April 2022. *Ulrich Decl.* ¶ 21, Ex. S, Dkt. 103-22.

### 7. Hayes Tax's Discovery Responses Related to the New Claims

After Hayes Management's motion for protective order was fully briefed, Hayes Tax served its answers and responses, including responsive documents, to Carbajal's first set of discovery. *Ulrich Decl.*, Ex. U, Dkt. 103-24; Ex. V, Dkt. 103-25. As already outlined in part above, many of the documents Hayes Tax produced directly contradict multiple representations made by Hayes Management and Hayes in this litigation related to the sale of assets to Hayes Tax, including that: (1) all negotiations of the sale were done orally, and no written documentation of any part of the negotiations exist; (2) no offers in writing of any kind to sell or purchase Hayes Management or it assets were ever made; (3) Hayes had no

memory of what amounts had been offered to either sell or purchase Hayes Management and attempts to identify the amount would be "speculation"; (4) the only offer to sell or purchase any of Hayes Management's assets was for $100,000 and made by Galles and Mann; (5) the December 30, 2020 Asset Purchase Agreement was the only transaction and the sum total of any assets related to or associated with Hayes Managements was $100,000; (6) Hayes never received any direct payments from Hayes Tax; and (7) the only payments Hayes received for work performed for Hayes Tax were payments for work performed through a difference company he owns, BCMS, Inc.

These various statements and representations have been shown to be false or misleading by the following specific documents produced by Hayes Tax:

1. Documentation of direct payments of $4,242.62 per month, starting in January 2022, made from Hayes Tax to Hayes (HTA 0001-0003).

2. 2021 "Consulting Agreement" entered into between Hayes Tax and Hayes, effective January 1, 2021, "[i]n connection with the Asset Purchase Agreement" through which Hayes was being directly paid for his services to Hayes Tax, and under which Hayes was being paid $2,000 per month, plus a 40% commission for tax return services he performed for Hayes Tax (HTA0004-0020).

3. "2020 Consulting Agreement" entered into between Hayes Tax and Hayes, effective January 1, 2022, "in connection with the Asset Purchase Agreement," through which Hayes was being directly paid for his services to Hayes Tax, and under which Hayes was being paid $1,000 per month, plus 40% commission for tax return services he performed for Hayes Tax.

4. "Second Asset Purchase Agreement" between Hayes, individually, and Hayes Tax, effective January 1, 2021, which purports to sell "Goodwill and other intellectual property of [Hayes] related to accounting, tax and business consulting services" and "[Hayes'] concurrent execution of restrictive covenants requiring Non-Disclosures, Non-Competition, and Non-Solicitation" in exchange for a purchase price of $400,000 (HTA 0050-0056).

5. A "Secured Promissory Note" for the sum of $400,000 between Hayes Tax and Hayes, with principal and interest paid in 120 equal monthly installments of $4,242.62 beginning January 5, 2022 (HTA 0057-0061).

6. A "Security Agreement" between Hayes Tax, Melissa Galles and Brandy Mann, and Hayes, creating a security interest in the "Pledged Securities of Hayes Tax & Accounting Services, Inc." which means "all shares of

capital stock of Hayes Tax & Accounting Services, Inc." (HTA 0062-0071).

7. A "Guaranty Agreement" between Melissa Galles and Brandy Mann (as Guarantors) and Hayes, guaranteeing payment of the $400,000 Secured Promissory Note (HTA 0072).

8. An "Early Sale Sell Agreement" which provides that if Hayes Tax is sold within 5 years of the date of purchase of Hayes Management, the net capital gain of the sale shall be divided equally between Melissa Galles, Brandy Mann, and Hayes (HTA 0073).

9. A Lease Agreement, effective January 1, 2021, between Lessor Eagle Spirit Management, LLC (another one of Hayes' entities) and Lessee Hayes Tax, leasing office space at 890 Oxford Street, Idaho Falls, Idaho for a period of 10 years for the sum of $5,000 per month (HTA 0074-87).

10. A memorandum on "Hayes Management Services, Inc." letterhead entitled "Intent to Sell."

Had Hayes Tax not produced these documents, Carbajal would have known only of the asset sale of $100,000.

## ANALYSIS

As Carbajal's request for terminating sanctions is potentially dispositive of Hayes Management's motion for a protective order, the Court will address the motions in reverse order.

### 1. Motion for Terminating Sanctions

Carbajal asks for default against Hayes Management on all her claims against it and dismissal of Hayes Management's counterclaims against her, as well as default against Hayes, individually, on her claims against him, as a sanction for Hayes Management and Hayes' "false statements in discovery responses, obfuscation, and abusive tactics." *Pl's Br. re Sanctions*, p. 14, Dkt. 103-1.

### A. Legal Standard for Terminating Sanctions

The rules of discovery are intended to ensure both parties have "access to the true facts" because "[t]here is no point to a lawsuit, if it merely applies law to lies." *Conn Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007) (internal quotation marks and citation marks omitted). The Court has two sources of authority through which it can impose sanctions for severe discovery abuses: the inherent power of the federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37. *See Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983); *see also Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Carbajal seeks terminating sanctions under the Court's inherent authority and Rule 37.

District courts have inherent power to impose sanctions, including default or dismissal, when a party has "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Fjelstad v. Am. Honda Motor Co., Inc.*, 762 F.2d 1334, 1338 (9th Cir. 1985); *see also TeleVideo*

*Sys., Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir. 1987) ("Courts have inherent equitable powers to dismiss actions or enter default judgments[.]"). Terminating sanctions are a severe remedy, and should be imposed only "where the violation is due to willfulness, bad faith, or fault of the party." *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996) (internal quotation marks and citation omitted); *see also Anheuser-Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 348 (9th Cir. 1995) (terminating sanctions are warranted where "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings"). The Court's factual findings may not be set aside unless they are clearly erroneous, and its credibility determination are entitled to special deference. *Anheuser-Busch*, 69 F.3d at 348.

"The most critical criterion for the imposition of a dismissal sanction is that the misconduct penalized must relate to matters in controversy in such a way as to interfere with the rightful decision of the case." *Tripati v. Corizon Inc.*, 713 F. App'x 710, 711 (9th Cir. 2018) (quoting *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 379 (9th Cir. 1988). This rule arises from due process concerns, which require a nexus exist between the party's actionable conduct and the merits of his case. *Hathaway v. Idaho Pac. Corp*., No. 4:15-CV-00086-DCN, 2020 WL 2858003, at *12 (D. Idaho June 2, 2020).

If such a nexus exists, courts must weigh the following factors prior to imposing terminating sanctions: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Anheuser-Busch*, 69 F.3d 337, 348 (9th Cir. 1995). The Court does not need to make explicit findings regarding each of the five factors. But a finding of "willfulness, fault, or bad faith" is required for dismissal or default judgment to be proper. *Id.* at 348; *Fjelstad*, 762 F.2d 1334, 1337 (9th Cir. 1985). "Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (citations omitted).

### B. Willfulness

The Ninth Circuit has held that "disobedient conduct not shown to be outside the control of the litigant is all that is required to demonstrate willfulness, bad faith, or fault." *Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1233 (9th Cir. 2006) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). "Providing false or incomplete information during a deposition or in a response to a discovery request constitutes the sort of willfulness, bad faith, or fault required for dismissal." *Hathaway*, 2020 WL

2858003, at *14 (citing *Arnold v. Cnty. of El Dorado*, No. 2:10–CV–3119 KJM

GGH, 2012 WL 3276979, at *4 (E.D. Cal. Aug. 9, 2012) (plaintiff acted in bad

faith by lying at her deposition); *Lowry v. Heritage Sec.*, No. 09–CV–882–BTM

WVG, 2011 WL 7769329, at *10, *14 (S.D. Cal. July 7, 2011), *report and*

*recommendation adopted sub nom. Lowry v. Metro. Transit Bd. MTBS, No*.

09CV00882, 2012 WL 1439078 (S.D. Cal. Apr. 26, 2012) (plaintiff acted with

willful disobedience in refusing to answer an interrogatory requesting his residence

address, even though plaintiff refused to provide such information to protect his

privacy); *Newman v. Brandon*, No. 1:10–CV–00687 AWI JL, 2012 WL 4933478,

at *5 (E.D. Cal. Oct. 16, 2012) (plaintiff acted willfully and in bad faith in

submitting falsified declarations in connection with a motion for summary

judgment)).

Carbajal has presented substantial and compelling evidence that

demonstrates serious misconduct by Hayes Management and Hayes in this case.

Hayes Management and Hayes deliberately withheld relevant and discoverable

evidence in this case and outright lied or misled Carbajal and the Court about the

existence of the withheld documents. Hayes Management in its discovery

responses and to the Court stated that all negotiations and offers related to the sale

of Hayes Management were conducted orally, that Hayes had no memory of any

specific amounts proposed or discussed regarding the sale, and any representations

regarding those amounts would be "pure speculation," that Hayes was not working directly for Hayes Tax but instead through one of Hayes' entities (BCMS, Inc.), and that the only offer to purchase Hayes Management led to the Asset Purchase Agreement selling the designated Hayes Management's assets for $100,000. These representations were false as shown by the nearly 100 pages of documents produced by Hayes Tax.

Hayes Management and Hayes insist that they provided Carbajal "exactly what she asked for—nothing more, nothing less." *Hayes Management and Hayes Resp. Br.*, p. 6, Dkt. 108. But this is not true. Carbajal explicitly asked Hayes Management to "identify each offer to sell or offer to purchase Hayes Management Services, Inc. from 2012 to date," to which Hayes Management responded that all offers "were oral only." When asked to supplement this response, Hayes Management repeatedly insisted it had no non-privileged documents related to the sale of Hayes Management. Hayes also testified in his sworn declaration filed in support of Hayes Management's motion for protective order that all negotiations and offers were exchanged orally. These representations were false. Hayes Management and Hayes had in their possession the Intent to Sell, which explicitly evinced Hayes' intent *in writing* "to sell the ***Hayes Management Services, Inc.*** to Melissa Galles and Brandy Mann" for $500,000. Yet, Hayes Management and

Hayes did not disclose this document – which is patently responsive – despite Carbajal's multiple requests.

Indeed, even faced with Carbajal's request for terminating sanctions, Hayes and Hayes Management failed to address the Intent to Sell or explain why it was not produced – instead wrongly claiming in their response that they had produced everything Carbajal requested. And they kept trying to ignore it through oral argument until they were directly asked why it was not produced; in response, Hayes' counsel could only muster that Hayes claims he "forgot" about this document. Significantly, Hayes did not provide this explanation under oath, and even his counsel appeared dubious of his client's claim of forgetfulness. That Hayes would have forgotten drafting a detailed, four-page memorandum that quite obviously served as template for structuring the transaction, and which he provided to attorney Wright to prepare the transaction documents, strains belief.

Hayes' explanation seems even more dubious when considering that among the documents he and Hayes Management sought to protect as privileged – and which were submitted for *in camera* review – was the "Intent to Sell" document. Hayes only had to review the documents he claimed were privileged to "refresh" his memory of the Intent to Sell's existence before he submitted to the Court a sworn declaration containing false statements that all discussions related to the sale of assets to Galles and Mann "were oral." *Hayes Decl.* ¶ 7, Dkt. 90-1. "The claim,

'I don't remember,' can be a lie if the speaker does remember, and even though no one can see another's memory, the falsity is subject to proof by circumstantial evidence, admissions, and other evidence." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1055 (9th Cir. 1998).

Carbajal also requested that Hayes produce documents "showing any payments or transfer of funds being made from Hayes Tax Accounting to Chris Hayes." Hayes did not produce any documents showing payments Hayes Tax made directly to him pursuant to the Second Asset Purchase Agreement and the 2021 and 2022 consulting agreements even though Carbajal explicitly requested documents showing "***any payments***" from Hayes Tax to Hayes. Instead, Hayes responded "there have been no payments from Hayes Tax to Hayes for the assets purchased by Hayes Tax from Hayes Management." Hayes' response is not only plainly evasive but appears calculated to prevent Carbajal from learning and proving the truth. Such a response "approached contumaciousness." *New Images of Beverly Hills*, 482 F.3d at 1095.

In short, the Court cannot abide Hayes Management and Hayes' argument that they provided Carbajal exactly what she asked for. First and foremost, this is not true as shown by the two examples cited above: Carbajal asked for specific documents, and Hayes Management and Hayes either falsely denied their existence outright or relied on deceptive wordplay to justify their failure to disclose the

documents. Second, to the extent Hayes Management and Hayes castigate Carbajal for not asking the right questions, how could she request documents she did not know and could not have known existed, but which are patently material to the issues in the case?[4]

This is not merely zealous advocacy; such conduct undermines the judicial process: If every party could fail to disclose key documents requested for production; represent to the opposing party and the court that requested documents do not exist or have been produced; and then, after another party produces those key documents, argue it has not violated any rules in hiding the information, no one would trust the judicial process. *See Hathaway*, 2020 WL 2858003, at *18. "Indeed, those actions, by definition, impair a party's ability to go to trial and likewise interfere with the rightful decision of the case." *Id.* With each discovery violation, Hayes and Hayes Management prejudiced Carbajal's ability to prepare for and try this case. *Id.*

It is particularly troubling to the Court that but for Hayes Tax's disclosure of these documents, Hayes Management and Hayes' deception may never have been discovered. In fact, it would appear Hayes Management and Hayes have no qualms about withholding these documents and making false and misleading

---

[4] At oral argument, counsel for Hayes Management argued that the second Asset Purchase Agreement for Hayes' personal goodwill did not show fraudulent intent but could be relevant to the issue of alter-ego liability; counsel later attempted to backtrack on this concession.

MEMORANDUM DECISION AND ORDER - 33

representations to Carbajal and the Court. To the Court's knowledge, neither Hayes Management nor Hayes have amended or supplemented their discovery responses. Hayes Management filed its response to Carbajal's motion for terminating sanctions more than two weeks late – and only after Court staff contacted counsel and asked if a response would be filed. Chris Hayes apparently joined in the late response "based on an oral phone conversation with defendant Chris Hayes' attorney, Norm Reece, who [was] in Hawaii through the week" the late response was filed. In their response, Hayes Management and Hayes merely argue that personal goodwill is an asset owned by the individual, not the entity, and Hayes' personal assets were never at issue and thus none of the withheld documents needed to be disclosed. As noted, they did not even bother to address the "Intent to Sell" and the false statements in their discovery responses and to the Court.

Based on these facts, the Court finds that Hayes Management and Hayes intentionally and in bad faith provided false, misleading, or incomplete information to Carbajal and the Court. These actions establish the willful conduct necessary for the imposition of terminating sanctions, and therefore the Court will consider next whether due process is satisfied.

### C. Due Process

A court's latitude in imposing case-terminating sanctions is constrained by the principles of due process, which require the existence of a relationship

"between the sanctioned party's misconduct and the matters in controversy such that the transgression threaten[s] to interfere with the rightful decision of the case." *Anheuser–Busch*, 69 F.3d at 348 (internal quotation marks and citations omitted) (alteration in original). If no such relationship exists, a court cannot impose terminating sanctions. *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982) (holding default entry violated due process where the sanctioned party's deception was wholly unrelated to the merits of the controversy).

In her Second Amended Complaint, Carbajal asserts claims for successor liability, alter-ego liability, and constructive trust, all of which require proof of fraud or some inequitable conduct. A constructive trust arises "when legal title to property has been obtained through actual fraud, misrepresentations, concealments, taking advantage of one's necessities, or under circumstances otherwise rendering it unconscionable for the holder of legal title to retain beneficial interest in property." *Snider v. Arnold*, 289 P.3d 43, 45 (Idaho 2012) (citing *Hettinga v. Sybrandy*, 886 P.2d 772, 772 (Idaho 1994). Similarly, successor liability requires proof that "the transaction is entered into to escape liability, *see, e.g., Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 182 n. 5 (1973), and alter-ego liability requires proof that observance of the corporate form would sanction a fraud, promote injustice, or lead to an inequitable result, *Lunneborg v. My Fun Life*, 421

P.3d 187, 199, 200 (Idaho 2018)). In addition, alter-ego liability requires proof of a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. *Id.*

Here, Hayes Management and Hayes' misconduct in withholding key documents, such as the Intent to Sell and the Second Asset Purchase Agreement, goes directly to the heart of Carbajal's claims that Hayes Management and Hayes sold their assets to Hayes Tax with the fraudulent intent of concealing those assets to avoid any potential judgment against it in this case. Indeed, the very act of concealing those documents, rather than simply disclosing them in discovery, gives additional credence to the claim that Hayes Management and Hayes entered into these transactions with a fraudulent intent. Likewise, Hayes' surreptitiously allotting $400,000, or 80 percent, of Hayes Management's purported value to his personal goodwill tends to show a "unity of interest and ownership" exists between Hayes and Hayes Management to a degree that no separate personalities exist, which is required for alter-ego liability to apply. Simply put, a clear relationship exists between Hayes Management and Hayes' misconduct and the matters in controversy related to successor liability, alter ego liability, and the imposition of a constructive trust such that the transgression threatens to interfere with the rightful decision of the case on these issues.

The Court therefore finds its it appropriate to prohibit Hayes and Hayes Management from contesting Carbajal's claim that Hayes is the alter ego of Hayes Management, and that Hayes is personally liable for all damages that may be awarded to Carbajal and assessed against Hayes Management in this litigation. The Court also finds it appropriate to prohibit both Hayes and Hayes Management from contesting Carbajal's claim that a constructive trust be imposed on any proceeds Hayes and Hayes Management have received, or will receive, from their sale of assets to Hayes Tax to ensure that sufficient assets are available to satisfy any damages that may be awarded to Carbajal in this action.[5]

But Hayes Management and Hayes' misconduct bears no nexus to Carbajal's employment claims against Hayes Management under Title VII and the IHRA. None of the withheld documents relate to Carbajal's allegations that Hayes Management subjected her to a hostile work environment or retaliated against her. Nor do the withheld documents relate to Hayes Management's counterclaims. Given this lack of nexus between Hayes Management's misconduct and these claims, the Court finds entering default judgment on the employment claims

---

[5] Such constructive trust on the proceeds from the asset sales will be imposed only to the extent judgment is entered in Carbajal's favor. If Carbajal seeks an order prohibiting Defendant Hayes Management and Hayes from transferring, encumbering, or disposing of this property while this litigation is pending, she may file an application for prejudgment writ of attachment or other appropriate motion seeking such relief, which the Court will consider at that time.

against Hayes Management and dismissing Hayes Management's counterclaims would violate due process.

The Court, however, recognizes that preclusion orders on the alter-ego theory and constructive trust claims may not impose a sufficiently severe sanction on Hayes Management for its misconduct in this litigation. Thus, if Carbajal feels additional, lesser sanctions, such as monetary or evidentiary sanctions, would be appropriate against Hayes Management to deter similar misconduct, she may file a motion proposing such alternative sanctions. If Carbajal seeks monetary sanctions, she must set forth the amount she seeks and the basis for such amount. In addition, Carbajal will be able to fully attack Hayes Management's credibility at trial based on its conduct in discovery.

Hayes Management and Hayes should nonetheless be warned that continued misconduct will put case-terminating sanctions back on the table. In *Valley Engineers Inc.*, the Ninth Circuit affirmed an award of terminating sanctions because the evidence established that the defendant knew about a damaging and "exceedingly important" memorandum but intentionally withheld it, denied its existence, and violated court orders to produce it for more than two years. 158 F.3d at 1053–1058. Under those circumstances, the Ninth Circuit concluded that a case dispositive sanction was appropriate, because the defendant "so damage[d] the integrity of the discovery process that there [could] never be assurance of

proceeding on the true facts...." *Id.* at 1058–1059. The Ninth Circuit has also held that "[e]ven a single violation of a discovery order can be justification for dismissing a case…if critical documents are being withheld, and the integrity of the entire process is called into question." *In re Hurt*, 210 F.3d 383 (9th Cir. 2000).

If Hayes Management and Hayes' pattern of deception in discovery continues, it will make it impossible for the Court "to be confident that the parties will ever have access to the true facts," and a case dispositive sanction may be appropriate at that time. *Id.*

### 2. Motion for Protective Order

Hayes Management seeks to protect from disclosure any communications between Chris Hayes, Melissa Galles, Brandy Mann, attorney Steven Wright, and attorney John Simmons related to the preparation of documents for the sale of its assets to Hayes Tax. Hayes Management maintains that attorney Steve Wright jointly represented Hayes Management and Hayes Tax in documenting the sale of assets to Hayes Tax even though they were adverse parties to an arm's length transaction, and therefore the withheld materials all contain material protected by the attorney-client privilege, as reflected in the privilege log.

Pursuant to this Court's Order, Hayes Management submitted to the Court for *in camera* review all emails and other documents, which it claims are privileged. The Court has reviewed these documents to determine whether the

attorney-client privilege applies. *See, e.g., Clarke v. Am. Com. Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992) ("A district court may conduct an in camera inspection of alleged confidential communications to determine whether the attorney-client privilege applies."); *In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982) (proper procedure for asserting attorney-client privilege as to particular documents is to submit them for court's in camera inspection, providing explanation of how information fits within privilege). The Court's analysis and conclusions articulated below incorporate the Court's findings from the in-camera review as applicable.

### A. *Attorney-Client Privilege*

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961)). As a rule of evidence, the privilege prevents the disclosure of a confidential communication made by a client to his attorney for the purposes of obtaining legal advice, as well as an attorney's advice in response to such disclosures. *U.S. v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009) (citing *United States v. Chen*, 99 F.3d 1495 (9th Cir. 1996)). The privilege's purpose

> is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co*., 449 U.S. at 389

Although an important protection to promote effective attorney-client relationships, the privilege is not absolute. "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." *Ruehle*, 583 F.3d at 608 (quoting *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002). "The privilege stands in derogation of the public's right to every man's evidence and as an obstacle to the investigation of the truth, and thus, it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* (quoting *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (brackets, ellipses, internal quotation marks omitted).

Courts typically apply an eight-part test to determine whether the attorney-client privilege applies: (1)  legal advice of any kind is sought (2) from a professional legal adviser in their capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at the client's instance permanently protected (7) from disclosure by the client or by the legal adviser, (8) unless the protection be waived. *Id.* (citing *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n. 2 (9th Cir. 1992)). "The party asserting the privilege bears the burden of proving each essential element." *Id.*

If a party withholds discovery information as privileged, "the party must: (i) expressly make the claim; and (ii) describe the nature of the documents,

communications, or tangible things not produced or disclosed-and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5). "The party wishing to withhold documents as privileged has the burden of establishing the privileged character of the communications." *Pollock v. Nationwide Mut. Ins. Co*., 549 F. Supp. 3d 1202, 1207 (D. Idaho 2021). "Boilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production of documents are insufficient to assert a privilege." *Id.* (citing *Burlington Northern & Santa Fe Ry. Co. v. U.S. District Court*, 408 F.3d 1142, 1149 (9th Cir. 2005)).

### B. Crime-Fraud Exception

Carbajal argues that Hayes Management's transfer of assets to Hayes Tax amounts to a fraudulent conveyance and therefore the crime-fraud exception applies here, vitiating any privilege protecting communications between Hayes, Galles, and Mann and Attorney Wright relating to the sale.

"The attorney-client privilege does not extend to attorney-client communications which solicit or offer advice for the commission of a crime or fraud." *In re Grand Jury Subpoena of Connelly*, 28 F.3d 106 (9th Cir. 1994) (quoting *In re Grand Jury Investigation (The Corporation)*, 974 F.2d 1068, 1071 (9th Cir.1992)) (brackets omitted); *see also Clark v. United States*, 289 U.S. 1 (1933). "Privileges are recognized because law-makers and courts consider

protecting confidential relationships more important to society than ferreting out what was said within the relationship. The privilege for communications between client and attorney ceases when the purpose of the privilege is abused, when the lawyer becomes either the accomplice or the unwitting tool in a continuing or planned wrongful act." *United States v. Ballard*, 779 F.2d 287, 292 (5th Cir. 1986). As Justice Cardozo wrote: "The [attorney-client] privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law." *Clark*, 289 U.S. at 14.

"The crime-fraud exception applies when (1) a "client consults an attorney for advice that will serve [them] in the commission of a fraud or crime," and (2) the communications are "sufficiently related to" and were made "in furtherance of" the fraud. *Eastman v. Thompson*, --- F.Supp.3d ----, 2022 WL 894256, at *19 (C.D. Cal. Mar. 28, 2022); *See also In re Napster*, 479 F.3d at 1090; *In re Grand Jury Proceedings*, 87 F.3d 377, 381–83 (9th Cir.1996). It makes no difference whether the attorney knew the client harbored an improper purpose or whether the scheme was ultimately successful. *In re Napster*, 479 F.3d at 1090. "The party seeking disclosure must prove the crime-fraud exception applies by a preponderance of the evidence, meaning "the relevant facts must be shown to be more likely true than

not." *Eastman*, --- F.Supp.3d ----, 2022 WL 894256, at *19 (quoting *United States v. Lawrence*, 189 F.3d 838, 844 (9th Cir. 1999)).

Courts have held that the crime-fraud exception applies to fraudulent transfers intended to defraud a potential creditor. *See, e.g., United States v. Ballard*, 779 F.2d 287, 293 (5th Cir. 1986); *In re Andrews*, 186 B.R. 219, 222 (Bankr. E.D. Va. 1995); *In re Cumberland Inv. Corp.*, 120 B.R. 627, 630 (Bankr. D.R.I. 1990). "The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated 'covinous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others.'" *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 541 (1994) (quoting 13 Eliz., ch. 5 (1570)). "English courts soon developed the doctrine of 'badges of fraud': proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent. *Id.* (citing Twyne's Case, 3 Coke Rep. 80b, 76 Eng.Rep. 809 (K.B. 1601); O. Bump, Fraudulent Conveyances: A Treatise upon Conveyances Made by Debtors to Defraud Creditors 31–60 (3d ed. 1882)). "The degree to which this statute remains embedded in laws related to fraud today clarifies that the common-law term 'actual fraud' is broad enough to incorporate a fraudulent conveyance." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 361 (2016). The "actual" component, however, means that the fraud committed

must be done with "wrongful intent," as opposed to "implied" fraud or fraud "in law," "which describe acts of deception that may exist without the imputation of bad faith or immorality." *Id.*

In *United States v. Ballard*, 779 F.2d 287, 293 (5th Cir. 1986), the Fifth Circuit held that the attorney-client privilege did not protect the defendant because it was clear from the record that the defendant used the advice of his former attorney in furtherance of concealing property from his creditors. The fact that the defendant used his attorney's counsel in furtherance of the crime of concealing from a creditor a property transfer made within one year of filing for bankruptcy, under 18 U.S.C. § 152, was enough in that case for the privilege to be pierced. *Id.* The defendant's actions in Ballard included conduct of "deception, dishonesty, misrepresentation, falsification, or forgery" because he sold property one month prior to filing for bankruptcy, hid the proceeds from the sale in his wife's safe deposit box, and did not disclose the sale or the proceeds in his bankruptcy filing. *See id.* at 290–91, 293.

Similarly in *In re Andrews*, 186 B.R. 219, 221–22 (E.D. Va. Bankr. 1995), the bankruptcy court found the circumstances sufficient to warrant application of the crime-fraud exception where the defendant made a number of transfers within the year before filing for bankruptcy but failed to disclose those transfers in his bankruptcy filings. The court used "badges of fraud" to find that the moving party

made a sufficient prima facie showing of fraudulent intent such that the crime-fraud exception was triggered. *Id.* at 222–24. Each of the three transfers at issue in that case was under scrutiny because defendant failed to disclose them in his bankruptcy filings. *See id*. at 221. A failure to disclose, as in *Ballard*, comfortably fits within the definition of "misrepresentation, dishonesty, and deception."

Similar indicia or "badges of fraud" exist in this case indicating that Hayes Management, through Chris Hayes, entered into the transaction with Hayes Tax as part of a fraudulent scheme to conceal Hayes Management's assets from Carbajal to avoid paying any potential judgment in her favor. Hayes sold Hayes Management's assets to his daughter and longtime employee while this litigation was pending; he admits that discussions relating to the sale did not begin in earnest until 2020, when his daughter and employee formed Hayes Tax – which occurred *immediately after* the Court denied Hayes Management's motion for summary judgment. The evidence further shows that Chris Hayes intended to sell Hayes Management's assets for $500,000, but then structured the transaction such that he sold Hayes Management's assets for a mere $100,000 and then allocated $400,000 of the purchase price – four times the purported value of Hayes Management's assets – to his individual goodwill.

These facts standing alone, while suspicious, might not be enough to establish fraudulent intent by a preponderance of the evidence given that it is

perfectly legal to sell assets from a business and to sell those business assets separately from individual professional goodwill in certain circumstances. A party may also sell business assets to a close relative and longtime employee while litigation is pending without it being "actual fraud." But these facts do not stand alone.

Instead, the evidence demonstrates that Hayes Management and Hayes actively and intentionally concealed not only the "Intent to Sell" document setting a $500,000 purchase price for "Hayes Management Services, Inc." but also concealed the Second Asset Purchase Agreement for Hayes' individual goodwill, as well as the other related agreements. In concealing these documents, Hayes and Hayes Management made false or misleading statements to Carbajal, her counsel, and this Court. Carbajal has also submitted sworn testimony from a former Hayes Management employee who overheard Hayes, Galles, and Mann discussing the plan to hide assets from Carbajal prior to the employee's resigning:

> When I was at work around [the] middle of November 2019, just before Thanksgiving, I overheard Mr. Hayes speaking with Ms. Mann and Ms. Galles about creating a new business and handing if off to Ms. Galles and Ms. Mann so that Hayes Management Services, Inc. could get out of the lawsuit. They spoke about how Ms. Carbajal was trying to get money out of Mr. Hayes, and how Mr. Hayes would just give the business to Ms. Galles and Ms. Mann so he would not have to pay any money.

*Alvarado Decl.*, ¶ 18.

This evidence provides sufficient "badges of fraud" – i.e., a sale to a close relative, an inadequate purchase price, the seller's continued participation in the business, a secret transaction, and false and misleading statements to the opposing party and the Court – to raise the presumption of fraudulent intent, and Hayes Management and Hayes have failed to rebut that presumption. The Court therefore finds it more likely than not that Hayes and Hayes Management entered into these transactions with Hayes Tax with the wrongful intent to conceal assets from Carbajal to avoid any potential judgment against it in this case.

The second prong for the crime-fraud exception to apply, which requires that the communications be "sufficiently related to" and made "in furtherance of" the fraud, *Eastman v. Thompson*, --- F.Supp.3d ----, 2022 WL 894256, at *19, is also satisfied. The Court's review of the email communications between Hayes, Galles, Mann, and Wright reveals that each communication furthered both asset purchase agreements, the consulting agreements, the covenant not to compete, and the other related transactions at the heart of the likely fraudulent scheme. Indeed, Hayes, Galles, and Mann hired Wright solely to paper the transactions at the heart of the scheme and each communication reflects a necessary step toward the accomplishment of the plan.[6] Likewise, any communications between Hayes, Mr.

---

[6] In reaching this conclusion, the Court notes that nothing in these communications suggests Mr. Wright was aware of any fraudulent intent or plan to hide assets.

Wright, and Mr. Simmons share a direct nexus to Hayes' ostensible end game. Because these communications furthered the likely fraudulent transfer, such communications are subject to the crime-fraud exception, and the Court will order their disclosure. *Eastman*, --- F.Supp.3d ----, 2022 WL 894256, at *25-26; *Transcon. Refrigerated Lines, Inc. ex rel. Young v. New Prime, Inc.*, No. 1:13-CV-2163, 2014 WL 2471936, at *10 (M.D. Pa. June 3, 2014) (finding crime-fraud exception applied based on likely scheme to unlawfully shift value from asset purchase transaction to individual's personal agreements in order to defraud bankruptcy creditors). In ordering the disclosure of these documents under the crime-fraud exception, the Court notes that these documents remain potentially relevant to issues relating to successor liability against Hayes Tax, and thus such documents are discoverable despite the preclusion orders on the alter-ego and constructive trust claims.

## ORDER

It is **ORDERED that**:

1. Defendant Hayes Management Service, Inc.'s Motion for Protective Order (Dkt. 90) is DENIED. Within ***seven (7) days*** of the date of this Order, Hayes Management must produce the privileged documents.

2. Plaintiff's Motion for Sanctions Against Defendant Hayes Management Services and Chris Hayes (Dkt.  is GRANTED in part and DENIED in part.

a.  Defendant Chris Hayes is prohibited from contesting Carbajal's claim that he is the alter ego of Hayes Management, and that he is personally liable for all damages that may be awarded to Carbajal and assessed against Hayes Management in this litigation.

b.  Defendants Chris Hayes and Hayes Management are prohibited from contesting Carbajal's claim that a constructive trust be imposed on any proceeds Hayes and Hayes Management have received, or will receive, from their sale of assets to Hayes Tax in order to ensure that sufficient assets are available to satisfy any judgment that may be awarded in Carbajal's favor in this action.

c.  Such constructive trust on the proceeds from the asset sales will be imposed only to the extent judgment is entered in Carbajal's favor. If Carbajal seeks an order prohibiting Defendant Hayes Management and Hayes from transferring, encumbering, or disposing of any proceeds from the sale of assets to Hayes Tax while this litigation is pending, she may file an application for prejudgment writ of attachment or other appropriate motion seeking such relief.

d.  If Carbajal seeks additional sanctions against Hayes Management, such as monetary or evidentiary sanctions, she may file a motion

MEMORANDUM DECISION AND ORDER - 50

within ***fourteen (14) days*** of this Order. If Carbajal seeks monetary

sanctions, she must set forth the amount she seeks and the basis for

such amount.

DATED: July 21, 2022

B. Lynn Winmill
U.S. District Court Judge